U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2026 JUL -6 P 3:41

CLERK

BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

MARYAM ZENALI,                      )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )      Case No. 2:24-cv-01198-cr
                                    )
DARTMOUTH-HITCHCOCK CLINIC,         )
                                    )
        Defendant.                  )

**OPINION AND ORDER
GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
(Doc. 62)

On June 14, 2024, Maryam Zenali, M.D., ("Plaintiff"), brought suit against Defendants Dartmouth-Hitchcock Clinic, Corp., ("DHC"), and Southwestern Vermont Medical Center ("SVMC") in the Vermont Superior Court. On November 1, 2024, the Vermont Superior Court dismissed SVMC as a defendant, and on November 15, 2024, DHC removed the action to this court on the basis of diversity jurisdiction.

In her Amended Complaint, Plaintiff asserts six causes of action against DHC:[1] breach of contract regarding Medical Director pay (Count I), breach of contract regarding severance pay (Count II), violation of the New Hampshire Wage Act ("NHWA") regarding Medical Director pay (Count III), violation of the NHWA regarding severance pay (Count IV), discrimination in violation of the Vermont Fair Employment Practices Act ("VFEPA") (Count V), and retaliation in violation of VFEPA (Count VI).

On October 31, 2025, DHC moved for summary judgment. (Doc. 62). On December 22, 2025, Plaintiff opposed the motion, (Doc. 67), and on January 23, 2026, DHC replied. (Doc. 76.) The court heard oral arguments on February 5, 2026, and

---

[1] Plaintiff included SVMC as a defendant in her Amended Complaint but only asserts claims against DHC.

thereafter took the motion under advisement.

Plaintiff is represented by Adam W. Waite, Esq. DHC is represented by William D. Pandolph, Esq.

## I.    Factual and Procedural Background.

### A.    DHC's Statement of Undisputed Material Facts.

In response to DHC's Statement of Undisputed Material Facts, Plaintiff disputes certain facts based on hearsay objections. Local Rule 56 requires that statements of fact "be followed by citation to admissible evidence or to evidence that can be presented in admissible form *at trial* as required by Fed. R. Civ. P. 56(c)." D. Vt. Loc. R. Civ. P. 56(d) (emphasis supplied). Accordingly, if evidence is not presented in an admissible form at the summary judgment phase but may be presented in an admissible form at trial, a court may consider it. *See, e.g., Brunette v. City of Burlington*, 2018 WL 4146598, at *21 (D. Vt. Aug. 30, 2018) ("While the content of the evidence submitted to support or dispute a fact on summary judgment must be admissible, 'the material may be presented in a form that would not, in itself, be admissible at trial.'") (citation omitted); *Gade v. State Farm Mut. Auto. Ins. Co.*, 2015 WL 7306433, at *16 (D. Vt. Nov. 19, 2015) ("Based upon the undisputed facts, the [expert] report is admissible for the limited purpose of demonstrating that, pre-lawsuit, State Farm consulted with an expert witness in the course of analyzing [the p]laintiff's 2008 [uninsured motorist] claim.").

Indeed, Fed. R. Civ. P. 56 contemplates the use of hearsay evidence at the summary judgment stage by allowing the submission of affidavits and declarations. *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: . . . citing to particular parts of materials in the record, including . . . affidavits or declarations[.]"). The court will therefore not exclude facts based on a hearsay objection unless there is no likelihood that the evidence could be admitted at trial.

### B.    Undisputed Facts.

Plaintiff was born in Iran in 1972. She obtained a Bachelor of Science from University of Houston in 2000 and a Doctor of Medicine from University of Texas

2

Medical School in 2006. Plaintiff became board-certified in surgical and clinical pathology in 2010 and obtained a medical license to practice in Vermont in 2012. In 2012, she completed a one-year surgical pathology fellowship with the University of Texas MD Anderson Cancer Center. Plaintiff has authored or co-authored twenty-five medical publications and "has delivered numerous lectures and presentations to students, medical residents, and colleagues on the subjects of pathology and gastrointestinal pathology." (Doc. 67-2 at 1, ¶ 1.)

From 2012 to 2020, Plaintiff was employed as a pathologist at the University of Vermont Medical Center ("UVMMC"). Prior to her employment at DHC, Plaintiff "complained that UVMMC discriminated against her in violation of the [VFEPA] on the basis of her gender, race, religion, and national origin." *Id.* at 2, ¶ 4. In response, "UVMMC raised issues regarding [Plaintiff]'s performance and interpersonal skills," which [Plaintiff] disputed. *Id.* at ¶ 5.

### 1.    Plaintiff's Employment at DHC.

In or around September 2020, Plaintiff sought employment in DHC's Putnam Physicians Division at SVMC. DHC's Chief Medical Officer, Carl "Trey" Dobson, M.D., and DHC's only other pathologist at the time, Honghui "Erin" Qiu, M.D., interviewed Plaintiff. Before hiring her, Dr. Dobson was aware that Plaintiff was from Iran and had an accent. On September 10, 2020, Plaintiff signed a Physician Employment Agreement ("PEA") with DHC with an effective date of November 16, 2020.

When a new physician commences employment at DHC, he or she undergoes a Focused Professional Practice Evaluation ("FPPE"), which SVMC's Credentials Committee oversees for "behaviors that may affect or undermine clinical practice." (Doc. 62-2 at 4, ¶ 23) (internal quotation marks and citation omitted). During Plaintiff's employment, Charles Salem, M.D., was the Chair of the Credentials Committee.

Under Plaintiff's FPPE, Dr. Qiu was required to review Plaintiff's work. At some point, Dr. Qiu's and Plaintiff's working relationship became strained and, "[w]hile [Plaintiff] reports having issues with how Dr. Qiu treated her, she does not assert Dr. Qiu was motivated by any discriminatory animus." *Id.* at 4, ¶ 27 (citations omitted).

3

Thereafter, Dr. Salem began supervising Plaintiff's work because Dr. Qiu and "'a number of [other] clinicians within the organization' . . . raised 'concerns about [Plaintiff's] abilities.'"[2] *Id.* at 4, ¶ 28 (citation omitted).

On January 21, 2021, "Dr. Qiu determined she could not work with [Plaintiff]"[3] and resigned, effective on April 30, 2021. *Id.* at 4, ¶ 31. Between Dr. Qiu's resignation and DHC's hiring of a new pathologist, leadership was "trying to provide some . . . ongoing day-to-day supports for [Plaintiff] utilizing [DHC's] pathology group." (Doc. 62-15 at 34:18-20.)

A few days later, on January 27, 2021, Dr. Salem sent the following email to Dr. Dobson:

> I met with [Dr.] Qiu on . . . January 21, 2021 for an update on the progress of her FPPE for [Plaintiff]. She had brought specific examples of cases in which she felt that [Plaintiff] was doing good quality work. She also had additional examples of readings where [Plaintiff] had failed to commit herself to an opinion and had sent the case out for outside review or internal review with her. The current use of outside review is about 20% of the total

---

[2] Plaintiff objects that some statements from Dr. Salem's deposition are hearsay. At trial, it is possible that the statements may not be offered for their truth but for the effect on the listener or to establish notice. *See Santiago v. Fischer*, 158 F.4th 397, 410 n.13 (2d Cir. 2025) ("[A] statement offered to show its effect on the listener is not hearsay.") (internal quotation marks and citations omitted); *United States v. Dupree*, 706 F.3d 131, 137 (2d Cir. 2013) ("We have repeatedly held that a statement is not hearsay where, as here, it is offered[] not for its truth[] but to show that a listener was put on notice.") (citations omitted). To the extent Plaintiff objects that certain statements reflect opinions, opinions may be admissible at trial if they provided notice to the employer of adverse work performance issues. *See* Fed. R. Evid. 701(a)-(c) (explaining that a lay witness may testify to opinions that are "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge"); *see also Cameron v. Cmty. Aid For Retarded Child., Inc.*, 335 F.3d 60, 65 n.2 (2d Cir. 2003) ("Because these statements [of complaints made by various employees about the plaintiff] are not used to prove the truth of the matter asserted, but to establish [the employer]'s state of mind, they are not hearsay as [plaintiff] contends.") (citation omitted).

[3] Dr. Qiu told Dr. Salem that Plaintiff "is no good" and "doesn't know what she's doing" and that Dr. Qiu "can't work with someone like that." (Doc. 62-15 at 38:5-6) (internal quotation marks omitted). As DHC's Director of Laboratory Services, Karen Bond testified, "Dr. Qiu was very clear that she did not think that [Plaintiff] had clinical skills that were up to standard[]" and Dr. Qiu "did not want to work with [Plaintiff] professionally. She felt that her reputation was in jeopardy." (Doc. 62-11 at 27:21-23, 28:17-19.)

reads for [Plaintiff] to date. The historical send out rate for the facility under Drs. Qiu and Demarco is about 0.5%. Dr. Qiu was very clear and consistent with her opinion that there is no danger to patients during this transition. Any case that [Plaintiff] is not certain on, she is seeking additional input before sending out a finalized read.

(Doc. 62-16 at 19.)

In late January 2021, Dr. Dobson met with Plaintiff to inform her that her FPPE would continue under Arief Suriawinata, M.D., a pathologist who chaired DHC's Department of Pathology and Laboratory Medicine. On February 2, 2021, Dr. Dobson emailed Dr. Suriawinata and others, stating, in part:

- A couple of surgeons, an oncologist, and a dermatologist provided me with their concerns of the reads by [Plaintiff][.]

- They note a high rate of send outs for what they believe are basic reads[.]

- They note a lack of information on the reads that are sent, for example, "melanocytic lesion, sent to Mayo[.]"

- The time from biopsy to diagnosis is significantly lengthened (7-10 days) when reads are sent out[.]

- They all note that [Plaintiff] is pleasant and easy to speak with but are concerned about the future of their work and patient relationships should she continue in this manner[.]

(Doc. 62-14 at 3.)

The following day, on February 3, 2021, Dr. Salem met with Plaintiff and told her that her FPPE would be performed "by [DHC] pathologists reviewing 10 to 20% of [her] reads and providing direct feedback." (Doc. 62-2 at 5, ¶ 35) (alteration adopted) (citations and internal quotation marks omitted). After the meeting, on the same day, Dr. Salem emailed Plaintiff as follows:

In summary, we discussed the very positive feedback that has been given about your pleasant and professional interpersonal interactions with laboratory staff and physicians. Your focus on providing good, thorough, accurate, safe pathologic readings is strongly supported particularly during your transition from a tertiary care center with narrow [gastrointestinal] focus to a very broad general community pathology lab. The lack of collegial support during this transition for you is recognized[,] and we discussed opportunities that are available to you through [DHC]'s

5

pathology department and the expectation that you will be reaching out to them to create relationships and [receive] support in helping you transition to improving your general pathology skills and confidence level. . . . The clear expectation for professional conduct particularly as it relates to any interactions with Dr. Q[iu] was reviewed. Unprofessional conduct[,] even if it is perceived as retaliatory[,] will not be tolerated. Any of those unprofessional behaviors will have a very negative [e]ffect on your performance review and ability to continue [to] work here.

I reviewed with you the expectation for turnaround time of pathology reads from time of biopsy to signed out report is 2 working days and generally 3 days maximum. In some instances[,] your turnaround times have been 2-3 times longer. You had raised some questions about lab processing which may be interfering with your ability to meet this expectation. You agreed that you would look into the process to make sure that it can support you in meeting this expectation.

I was clear with you about the clinician's expectation that the pathologist give their best impression as well as the reason for the case being sent out for additional review. We acknowledged the general benefits of outside review particularly where there has been a lack of internal peer support. The delay in getting a definitive answer to patients[] [and] the potential increased cost to the patient and the institution were reviewed. The historical send out rate of approximately 0.5% of the total reads was compared to your current rate[,] which is approximately 10%. I was clear with you that safety is the absolute most important part of the decision-making as it related to send outs. The expectation[,] however[,] is that as your skills and confidence are regained and a relationship [is] formed with [DHC,] that fewer send outs should be required in the future.

(Doc. 62-20 at 31.) Thereafter, DHC staff members and medical providers "reported concerns about" Plaintiff,[4] and "Dr. Salem determined there was a lack of improvement on [Plaintiff]'s part after his February 3, 2021 email." (Doc. 62-2 at 5-6, ¶¶ 38-39) (citations omitted).

After Dr. Qiu left DHC on or about April 30, 2021, DHC hired Leslie Dowd, M.D., as a pathologist. The next month, on May 24, 2021, "based on her work for DHC," Plaintiff was issued a certificate of qualification by the New York State Department of

---

[4] Defendant recites these complaints lodged by staff and other doctors at some length which included Plaintiff's alleged difficulty in accepting feedback, disorganization, unclear and frequently changing directions, and inadequate and untimely reads. *See* Doc. 62-1 at 10-13.

Health to act as a laboratory director in clinical chemistry, diagnostic immunology, endocrinology, hematology, immunohematology, and virology. (Doc. 67-2 at 4, ¶ 24.)

The following month, on June 22, 2021, Dr. Dobson emailed Plaintiff the following:

> I am compelled to again bring to your attention my concerns, as I have done in previous conversations and []as Dr. Salem discussed with you last week. I am growing increasingly troubled about pathology services.
>
> First, there is far too much attention being required from medical staff and leadership in regards to personal relationships and interactions, both between you and the two other pathologists that have been present in our system, and between you and physicians seeking pathology reads for their patients.
>
> Second, from the medical staff['s] perspective, confidence in pathology reads has eroded, and timeliness of communicating definitive reads has increased, which[,] again, Dr. Salem conveyed to you last week.
>
> A plan of action is required when we meet next week. We will address in person then without further email discussion.

(Doc. 62-16 at 4.) At this point, no DHC staff members had raised "these same concerns about Dr. Dowd[,]" and "[Dr. Dowd's] work was . . . satisfactory from [DHC]'s perspective." (Doc. 62-2 at 7, ¶ 50; Doc. 62-15 at 43:21-22.) Dr. Salem testified that "the amount of time and effort that was being spent on pathology and the lab was inordinate. It's unlike anything else that I've seen in over two and a half decades of working at SVMC." (Doc. 62-2 at 7, ¶ 51) (alterations adopted) (citation omitted).

That same month, on June 30, 2021, Plaintiff met with Dr. Dobson and Dr. Salem, during which Dr. Dobson "noted [Plaintiff]'s tendency to respond to questions in a tangential way." *Id.* at 8, ¶ 53. At the meeting, as Plaintiff testified, "Dr. Dobson [] talked about my speaking[,] and [at] some points[,] he would either pretend [he did not understand me] or he would say I don't understand." (Doc. 62-19 at 11:15-18.) In his deposition, Dr. Salem testified that he received complaints from DHC staff members that Plaintiff "would 'avoid the question that she was being asked[,]' which 'led to frustration among the staff.'" (Doc. 62-2 at ¶ 54) (alteration adopted) (citation omitted).

Following the meeting, on the same day, Plaintiff emailed Dr. Dobson, Dr. Salem,

and DHC's Director of Laboratory Services, Karen Bond, M.S., stating:

> Please note that I was informed that my random review cases have not been sent to DH[]C, because of me requesting them not to be sent ??? I [n]ever said that. Do you know who may have said that?
>
> I know that we are all very busy, but please let me know . . . [o]f anything you hear or [o]f anything you want me to know of. That is very important to me; second[]hand information does not do anyone justice. I am hoping we keep very open communication about any matter in the lab. Please let any other person who may have come to you directly and skipping me[] to know about that as well.
>
> ***
>
> If someone is confused or do[es] not know what to do, please let me know, and I [will] address that in person [to] my best abilities. But at the same time, in case[] it is not me but the comment is made because of alternative reasons, then [it] is out of my hand[s] and best to be left alone. So I [would] love to get specifics on anything that we need to do or can reasonably act upon.

(Doc. 62-18 at 84.)

The following day, on July 1, 2021, Dr. Dobson emailed Ms. Bond in regard to Plaintiff's meeting and email:

> We were transparent with concerns, including difficulty forming collegial relationships, directives and tangential communications to staff that lack clarity[], ceasing the send out of 20% random slides to DH[]C for [quality assurance ("QA")] as part of [FPPE] review, and regular ongoing professional practice review of 10% of cross[-]reads between both pathologists for QA, with disagreements sent for external.
>
> She was adamant that she did not prevent or suggest that slides not be sent to DH[]C as part of her FPPE, although she offered no explanation as to why her communications with [Dr. Suriawinata] stopped.

*Id.* at 83. In the same email, Dr. Dobson explained the next steps to be taken with regard to Plaintiff and stated: "We do envision that [] the above actions will support [Plaintiff] in her efforts to improve and[,] if unsuccessful, will provide a basis to seek another [M]edical [D]irector." *Id.*

Ms. Bond responded to Dr. Dobson the same day, on July 1, 2021, expressing "concerns for [Plaintiff's] lack of culpability in these situations. This recent email is

8

another example[;] it's not a plan or an explanation[,] just a random collection of thoughts and circular[-]speak about why she doesn't really have anything to work on." *Id.* at 82. Ms. Bond also relayed concerns about Plaintiff's "time management and emotional awareness with staff[]" as follows:

> [Plaintiff's] verbal disagreements and complaining about [Dr. Dowd] causes discomfort[.] [T]wo incidents led to staff hiding in my office while I was at a meeting. [Plaintiff] dismisses feedback with "well[,] they did not tell me they were upset[.]"[] As we know[,] that's not how it always works with staff. We need to be able to read the changes and ask open[-]ended questions to get them to open up and maybe address what is making them uncomfortable or unhappy. She doesn't seem to have the skill right now to think past the initial confrontation and foster long[-]term relations. This might be the heaviest lift.

*Id.*

A few days later, on July 5, 2021, Plaintiff sent Dr. Dowd an email to "summar[ize and] follow up o[n] what [they] discussed last week[,]" (Doc. 67-6 at 1), wherein Plaintiff stated in part:

> - I randomly review your cases[,] and please randomly review my cases[;] [it] is not ego or anything but[,] as I said[,] the outcome. If [there is] anything that there is a major difference in opinion[] [on], [it] should be sent out for subspecialty pathology review. I have been doing that for your cases, but I do not see that you have incorporated all the results that came back on your cases, despite multiple notices[.]
>
> - A re-excision skin case you had on Friday, on the prior skin biopsy[,] there was immunostaining record mismatch. I have brought to your attention in person to please correct it[.] [M]istake[s] can happen, but this is a reminder to please correct it. Stains were ordered on B[,] but you stated it for part A (part A and B are different lesions/ different sites). The re-excision is placed on your desk[;] please correct the prior biopsy (when you re-review).

*Id.* at 1-2.

That same month, on July 12, 2021, Dr. Dobson sent an email to Plaintiff, summarizing their June 30, 2021 meeting as follows:

> I want to summarize our discussion in order to organize the action items a[n]d expectations.

9

We outlined several concerns and opportunities for improvement, including[:]

- Laboratory staff have expressed a lack of clarity in communications with and directives from you as a pathologist and as the [Medical D]irector[.]

- Medical staff have noted uncertainty on which reads are deemed final and which have been sent externally for additional review, with little to no clarification from you, leading to an erosion of confidence from medical staff in pathology reads[.]

- There has been a significant increase in the time from biopsy to communication of definitive results to patients, a result of delayed turnaround time in pathology[.]

- It does not appear that quality reviews are being performed between pathologists on a certain percentage of reads – typically 10%-20% of those not sent for external review – and recorded as per policy[.]

- Regular review of slides by DH[]C pathology as a part of your [FPPE] suddenly ceased, as did your communications with DH[]C pathology[.]

You noted that[:]

- You were unaware of these concerns despite conversations with [Dr. Salem] and our joint meetings over the past several weeks[.]

- You did not direct slides read by you and chosen at random to be withheld from being sent to DH[]C as part of your FPPE[.]

- You brought up concerns about the quality of reads by your pathology colleague, Dr. Dowd[.]
  - [Dr. Salem] recounted a conversation he had with DH[]C pathology who reviewed a selection of Dr. Dowd's cases, noting concurrence with a majority of reads, a discrepancy in a prostate biopsy read, and a deficiency in dermatopathology[.]
  - A comparison among pathologists in the department to determine discrepancy rate could not immediately be made due to lack of quality reviews as described in bullet 4[.]

- You noted that neither individuals in the laboratory nor medical staff have informed you of concerns with their communications with you[.]

We decided upon action items to include[:]

- You developing an awareness and recognition that your

10

communication with laboratory staff, medical staff, the laboratory director, [Dr. Salem], and [me] is frequently tangential, leading to loss of focus on the issue under discussion;

- o We discussed that being [M]edical [D]irector of the laboratory requires clear communication to set expectations, and

- o That pathologist[s] need to communicate findings clearly to ordering physicians, including the expected turnaround times and finality of reads (whether the read is preliminary and [has] been sent out or is a final read with no additional reads forthcoming)[.]

- The FPPE is to resume immediately, with the laboratory director or designee sending 20% of your slides (not previously sent for external review) to DH[]C for interpretation[.]

- All dermatopathology to be sent externally[.]

- Dr. Dowd to participate in general pathology reads[.]

- Quality review between you and Dr. Dowd to [] commence per policy[.]

- Weekly meeting for the foreseeable future to include you, Dr. Dowd, [Ms.] Bond, and [Dr. Salem] or [a] designee to address concerns[.]

- Recognition that appropriate findings on FPPE must occur to maintain medical staff privileges[.]

(Doc. 62-18 at 85-86.)

Later that day, on July 12, 2021, Dr. Dobson emailed Plaintiff the following:

- Please cease the routine use of emails between pathologists, except as needed for urgent or emergent issues in which verbal communication is not possible[.]

- The frequency and length of emails is causing additional consternation; I am concerned that the strife could jeopardize the integrity of pathology services[.]

- The appropriate time and place to communicate issues is at the weekly meetings with Dr. Salem or myself so that a dialogue may occur and solutions [be] readily identified[.]

(Doc. 62-12 at 7.)

On July 21, 2021, Plaintiff responded to Dr. Dobson's July 12, 2021 summary email, stating in part:

Lastly[,] if for one reason or the other you decide or due to some

11

extraneous force [it] is decided, I am totally fine to step down from [the M]edical [D]irector[] position, in particular when[,] despite all the genuine effort for improvement (there have been many new changes implemented in the lab since I came and it was not always easy… ), you might not [be] happy with my work, I would be okay to graciously step down.

(Doc. 62-14 at 15.)

Two days later, on July 23, 2021, a nurse, Naomi Bolognani, RN, emailed Dr. Dobson, Dr. Salem, and an oncologist, Charlene Ives, M.D., as follows:

I am concerned with the number of patients [a]ffected by the pathology situation here at SVMC.

I've been in my new role for six weeks[,] and I've heard of three misdiagnosed cases. This is unacceptable and far from "Best Practice[.]"[]

I am aware of too many patients impacted by:

- Delayed diagnoses
- Misdiagnoses
- Inaccurate tests performed on specimens
- Delayed send outs

To support high-quality care, especially in cancer services, diagnoses must be timely and accurate.

Please let me know how I can support a process to achieve prompt, precise diagnoses for our patients. Our current process cannot continue.

*Id.* at 16-17. Dr. Dobson responded, stating that he was "aware of issues[]" and "working to rectify them as quickly as possible." *Id.* at 16.

The next month, on August 2, 2021, Dr. Ives replied, stating:

After taking a few days to contemplate, then having another tumor board interaction, it is clear that the issues surrounding pathology are complex[] but not improving.

The latest concern is that staff has been instructed by [Plaintiff] to no longer bring issues forward to the group, but only discuss with her.

It would seem at this point there needs to be more immediate action as it poses ongoing risk to patient care and outcomes.

It is morally and ethically wrong for me not to insist on action now to avoid further compromise to patient care.

*Id.*

12

Two days later, on August 4, 2021, Plaintiff sent Dr. Salem an email, indicating that she was out of the office and could not meet, and Dr. Salem responded: "I met with [Dr. Dowd,] who feels that you have established a good system and functional working relationship[,] which I was pleased to hear. I will try to catch you tomorrow[.]" (Doc. 62-16 at 28.) With respect to Dr. Salem and Dr. Dowd's meeting that day, Dr. Salem testified as follows:

> [Dr. Dowd] had suggested that . . . [he and Plaintiff had] gone back to . . . being able to review one another's work, slides, and that they were able to communicate in a professional and constructive manner and that[,] at least at the time of that meeting, he felt like, from a relationship standpoint, that things were, at least at that moment in time, on good footing.

(Doc. 62-15 at 67:7-13.)

In or around mid-August 2021, the relationship between Plaintiff and Dr. Dowd deteriorated, and Dr. Dowd stated that he would resign "if [Plaintiff] continued to run [DHC]'s pathology department." (Doc. 62-2 at 12, ¶ 69) (citation omitted). On August 17, 2021, Dr. Dobson concluded that Plaintiff "should no longer be working for [DHC] due to continued behavior [that] undermine[d] the culture of safety[]" of the Department of Pathology and reached out to Karen Aframe, DHC's Director of Employee Relations, "to discuss steps in termination." (Doc. 62-13 at 77:15-16, 78:6.)

The following month, on September 2, 2021, Dr. Salem and Dr. Dobson met with Plaintiff regarding her employment. Although the parties do not clarify the exact date, at some point in early September 2021, Plaintiff's employment at DHC ended. On September 3, 2021, Dr. Dobson emailed DHC executives, stating, "I met with [Plaintiff] yesterday afternoon. She will be resigning Tuesday[, September 7, 2021,] and has been relieved of her work effective today after completing active cases." (Doc. 62-18 at 72.) "During and following the termination of [Plaintiff]'s employment, DHC claimed that she resigned." (Doc. 67-2 at 6, ¶ 38) (citation omitted).

While employed at DHC, Plaintiff "never reported being discriminated or retaliated against for any reason" and "[n]o express comment was made about

13

[Plaintiff]'s accent[.]"[5] (Doc. 62-2 at 3, ¶¶ 20, 21) (citation omitted). Dr. Salem testified that Plaintiff's "fluency in English is excellent." (Doc. 62-15 at 53:24-54:1.) Throughout her employment, however, Dr. Dobson would say things to Plaintiff, such as "what did you say?" "I don't understand[,]" "you speak tangential[ly]," "it's hard to understand you[,]" and "[you] need to go to a class to learn how to speak." (Doc. 62-19 at 13:23-14:2; Doc. 62-17 at 95:20-21.)

After Plaintiff left DHC, "she applied for a position as a pathologist at UConn Health in Connecticut, which required her to obtain a license to practice in that state." (Doc. 67-2 at 6, ¶ 41) (citation omitted). Plaintiff requested that DHC provide Connecticut's licensing authority with "verification of . . . [Plaintiff's] ability to practice as a physician with reasonable skill and safety." (Doc. 67-10 at 1.) In response, Dr. Dobson emailed a Connecticut licensing official the following: "Based on incomplete information and observation, [Plaintiff] did practice with reasonable skill and safety[.] However, she resigned before her practice evaluation was complete[.]" (Doc. 72-3 at 1.)

## 2. Plaintiff's Employment Agreement With DHC.

Plaintiff's PEA provided her with an annual base salary of $311,000 for the first year and stated that she would receive an additional $19,500 "for duties as described in the job description for Medical Director of Pathology." (Doc. 62-6 at 6, § 5(b).) These duties included "oversight responsibility of the practice of pathology and laboratory services in the organization." (Doc. 67-2 at 2, ¶ 8) (internal quotation marks and citation omitted). "The [$19,500] amount is 1/12th for each full month Physician remains employed by DHC within the [twelve-]month period of when that bonus occurred." (Doc.

---

[5] Plaintiff does not dispute the accuracy of this statement but objects that it is lacking a citation to supporting evidence. However, because Plaintiff does not allege that any DHC employee made an express or direct comment regarding her accent, the court will consider this fact undisputed. *See Staten v. Semple*, 2021 WL 1060225, at *2 n.5 (D. Conn. Mar. 19, 2021) ("In the absence of meaningful citations to the record, the [c]ourt may 'deem certain facts that are supported by the evidence admitted.'") (alteration adopted) (citation omitted); *Melvin v. Cnty. of Westchester*, 2019 WL 1227903, at *1 n.1 (S.D.N.Y. Mar. 15, 2019) ("[W]here [p]laintiff has offered no citation to admissible evidence in the record, the [c]ourt will only consider that fact to the extent it is undisputed by [d]efendants.").

14

62-6 at 6, § 5(b).)

The PEA "makes no express reference to any 'severance pay.'" (Doc. 62-2 at 3, ¶ 17.) Either party could terminate the PEA without cause, and DHC could terminate the PEA for cause. With respect to termination without cause, the PEA states:

> Either party may terminate this Agreement, without cause, at any time upon one hundred twenty (120) days['] prior written notice to the other party. If DHC terminates the Agreement without cause, then DHC may, in its discretion, choose to pay the equivalent of one hundred twenty (120) days['] base salary in lieu of providing the one hundred twenty (120) day prior notice.

(Doc. 62-6 at 7, § 6(b).)

Regarding termination for cause, the PEA provides the following:

> DHC may terminate Physician's employment hereunder at any time for "cause[.]"[] In the event Physician is terminated for cause, no advance notice is required to be given to Physician, and termination shall be effective immediately upon notification by DHC. DHC shall have sole discretion to determine if such cause exists, subject to the due process review referred to in this Section 6(c).

*Id.* at § 6(c).

The PEA provides examples of "[s]uch cause" including "failure by Physician to meet patient care quality standards established by DHC[,]" "the determination of DHC in good faith that Physician is not providing adequate patient care so that the health, safety[,] or welfare of patients is jeopardized by continuing the employment of Physician[,]" "conduct by Physician which DHC considers to be . . . disruptive[,]" "acts or omissions which harm the reputation of DHC or its members, or jeopardize either or both of their good relations with patients, hospitals, third-party insurers, other health care providers, or the community at large[,]" and "conduct by Physician which is disruptive to the proper functioning of [DHC], or which violates Physician's duties to conduct Physician in a professional, collegial, courteous[,] and cooperative manner[.]" *Id.* at 7-8, § 6(c)(3), (9), (11), (12), (13).

Regarding notices, the PEA generally provides that "[a] notice given by one party to the other pursuant to this Agreement shall be deemed properly given if it is in writing

15

and either hand delivered or sent by registered or certified mail[.]" *Id.* at 9, § 11. The PEA's choice-of-law clause states that it "shall be governed, construed, and enforced in accordance with the laws of the State of New Hampshire." *Id.* at 10, § 12.

### 3.    Medical Director Pay.

Plaintiff seeks $19,500 for acting as Medical Director of Pathology while an employee for DHC. It is unclear when Plaintiff became a Medical Director, but on June 21, 2021, an Administrative Assistant for DHC sent an email to DHC employees, including Plaintiff, stating:

> A friendly reminder that all timesheets are due Wednesday for your "special pay hours" June 13-26. Special pay includes [M]edical [D]irector[] hours, per diem hours, or any hours outlined in your contract stating that you need to submit hours in order to get paid. Also, remember that hours need to be entered within [thirty] []days of being worked, or they will not be paid[,] []per policy.
>
> Please use the online timesheet tool. . . .
>
> Any hours that are not submitted by the end of the day Wednesday will not be paid this pay period. . . . [DHC] is very strict about the submission of these hours and will not accept anything after the deadline.

(Doc. 62-18 at 63) (emphasis omitted).

In an entry dated May 4, 2021, Plaintiff submitted twenty-five hours in her role as Medical Director for work performed from "May to present date in June[,]" and in an entry dated May 5, 2021, Plaintiff submitted twenty-five hours for work performed in this role from May 5 to May 20, 2021. (Doc. 62-7 at 1.) On July 16, 2021, DHC paid Plaintiff $3,750 for her Medical Director hours. Aside from these payments, Plaintiff did not receive additional compensation for her role as Medical Director.

When asked if there were any Medical Director responsibilities which Plaintiff did not perform, Ms. Bond testified that Plaintiff did not participate in developing "an annual budget for capital equipment because she was not [M]edical [D]irector during that time." (Doc. 62-11 at 25:21-23.) Otherwise, Ms. Bond stated, "I c[an't] speak to if [Plaintiff] participated in any continuing education activities. I don't recall." *Id.* at 26:7-8.

Ms. Bond testified that policy review was within the duties and responsibilities of

16

a Medical Director:

> The College of American Pathologists is our accrediting body, and they have rules on how often a policy needs to be approved or reviewed or any changes that need to be made to it so if they change their rules.
>
> When you have a new [M]edical [D]irector come on board, the expectation is that they review and approve each policy. So if there's 1,000 policies, they need to read and approve 1,000 policies. They could be reviewed without [M]edical [D]irector[] involvement every two years after that unless there's a significant change.

*Id.* at 20:4-14. The College of American Pathologists required Medical Directors to complete policy review "in a timely manner not to exceed six months . . . at the time." *Id.* at 21:1-3. Ms. Bond testified that Plaintiff "'was probably complete' with the process of reviewing the pathology department's policies and procedures at the time of her termination." (Doc. 67-2 at 5, ¶ 32) (citation omitted).

Plaintiff testified that, after her email on July 21, 2021 wherein she proposed stepping down from her Medical Director position, she "continued to do the [associated Medical Director] work" until her employment ended in September 2021. (Doc. 62-17 at 151:4.) While working at DHC, Plaintiff "did not claim she was entitled to any [M]edical [D]irector[] pay without having to actually perform [M]edical [D]irector[] work or timely submit her hours[.]" (Doc. 62-2 at 6, ¶ 45.)

### C.   Disputed Facts.

#### 1.   Plaintiff's Employment at UVMMC.

DHC points out that "[a] reference submitted by [Plaintiff]'s supervisor at UVMMC noted that [Plaintiff] 'had only practiced Gastrointestinal and Liver Pathology at UVMMC, so [she] does not have recent experience in other areas of Anatomic Pathology practice, and never practiced Clinical Pathology/Laboratory Medicine while at the [UVMMC].'" (Doc. 62-2 at 2, ¶ 11) (alteration adopted) (citation omitted). Plaintiff testified that she was practicing general pathology during her "first few years" at UVMMC and claims she "had several years[ of] experience in general pathology at UVMMC." (Doc. 76-2 at 2; Doc. 67-1 at 3.)

### 2.   Plaintiff's Discrimination Complaint Against UVMMC.

DHC contends that "[t]here is no evidence that Dr. Dobson was aware prior to or while she was employed by DHC that [Plaintiff]'s separation from her prior employment with [UVMMC] was involuntary or of any concerns UVMMC had about her job performance[]" and that, "[i]n connection with the hiring process, [Plaintiff] falsely certified to DHC that she had 'voluntarily separated from UVM[MC] to pursue other interests.'" (Doc. 62-2 at 2, ¶¶ 8, 9) (citation omitted). According to DHC, "[t]here is no evidence that Dr. Dobson (or anyone else employed by DHC) was aware before or while [Plaintiff] was employed by DHC that she had made a discrimination claim against UVMMC or otherwise engaged in any protected conduct[]" and "[Plaintiff] does not know whether Dr. Dobson 'knew that she had filed a complaint of discrimination concerning her employment at UVMMC.'" *Id.* at 2, 8, ¶¶ 10, 56 (alterations adopted) (citations omitted). Dr. Dobson testified that, during Plaintiff's hiring process, he did not learn "that she had complained that UVMMC had discriminated against her[.]" (Doc. 62-13 at 22:17-19.)

Plaintiff contests DHC's assertions and contends that, at the June 30, 2021 meeting between herself, Dr. Dobson, and Dr. Salem, when discussing how Plaintiff is "difficult to work with[,]" Dr. Dobson "said, 'Did you have' – 'You had similar issues in UVMMC, didn't you,' something to that extent, 'that you had this before, this problem[]?'" (Doc. 62-17 at 65:5-9.)

### 3.   Plaintiff's Employment at DHC.

Plaintiff contends that Dr. Qiu had "agreed to provide clinical support to [Plaintiff] in clinical pathology, especially cytology readings, for [Plaintiff] to acquire practical experience[]" but "Dr. Qiu did not provide mentorship and support to [Plaintiff.]" (Doc. 67-2 at 2, ¶¶ 9-10) (citations omitted). DHC disputes these claims and asserts that "Dr. Qiu and [Plaintiff] had difficulties working together from the outset." (Doc. 62-2 at 4, ¶ 26.) Plaintiff responds that "Dr. Qiu and [Plaintiff] had a cordial and professional relationship at the start of [Plaintiff]'s employment with DHC[]" and the tensions between Dr. Qiu and Plaintiff only "started [sometime] after [Plaintiff] started to work at

18

[DHC][]" and were "exacerbated after [Plaintiff], as Medical Director of Pathology, started to make observations and recommendations to Dr. Qiu about her diagnoses and task distribution[.]" (Doc. 67-1 at 4; Doc. 67-2 at 2-3, ¶ 11) (citations omitted).

Plaintiff claims that, "[d]uring the few months that [Plaintiff] worked with her, Dr. Qiu made several misdiagnoses of which [Plaintiff] became aware, including a lymphoma she identified as a carcinoma, a carcinoma she identified as non-cancerous, and a spindle cell tumor she identified as non-diagnostic, leading to repeated biopsies." (Doc. 67-2 at 3-4, ¶ 19) (citing 67-3 at 2, ¶ 11). DHC counters that "no documents were produced during discovery to support this new allegation, nor [were] any documents cited in [Plaintiff]'s Affidavit." (Doc. 76-2 at 8.)

Plaintiff claims that Dr. Qiu was aggressive and that Dr. Salem "acknowledged that Dr. Qiu was aggressive toward [Plaintiff], and said that he had never seen such aggression so early in someone's tenure before the aggressor even had a chance to get to know the target of the aggression." (Doc. 67-2 at 3, ¶ 12.) DHC disputes this, pointing out that Dr. Salem testified that Plaintiff "exhibited unprofessional conduct[]" and that "[Plaintiff]'s prior deposition testimony was that she did not know why Dr. Qiu was aggressive." (Doc. 76-2 at 5-6) (citation omitted).

Between Dr. Qiu leaving and Dr. Dowd starting at DHC, Plaintiff asserts that DHC's Department of Pathology "did not provide the expected day-to-day support to Plaintiff[]" and that Plaintiff "taught herself cytopathology[] and, with piecemeal assistance from others, how to use the software system, over the course of her tenure with DHC." (Doc. 67-2 at 3, ¶¶ 16-17) (citation omitted). DHC disputes this and points out that, in her Charge of Employment Discrimination, Plaintiff wrote, "[u]pon information and belief, I was a more highly trained and skilled pathologist than [Dr. Qiu and Dr. Dowd]." (Doc. 62-18 at 79.)

Dr. Salem testified that "there was a general lack of confidence in [Plaintiff's] ability and reads[]" and "concerns about the 'percentage of [Plaintiff's] cases being sent out for additional review' and the length of time between when 'the specimen was provided to the lab and the time a final read was available to the practitioner and the

19

patient.'" (Doc. 62-2 at ¶¶ 29-30) (alterations adopted) (citations omitted). Plaintiff contends that her "send-out rate for ancillary work was not out of the ordinary in modern pathology, especially in light of SVMC's lack of certain onsite capabilities[;] e.g., immunostaining." (Doc. 67-1 at 5.)

According to Plaintiff, while she was employed by DHC, "Dr. Salem specifically requested that [she], rather than Dr. Dowd, look at one of his breast cases[,]" and "other DHC providers specifically requested that [Plaintiff] review cases that had been read by Dr. Dowd and/or directed their cases to [Plaintiff]." (Doc. 67-2 at 4, ¶¶ 21, 23) (citations omitted). DHC disputes this, claiming "it is not possible to respond[]" to these facts "without provider information" and pointing out that "pathologists frequently review each other's cases." (Doc. 76-2 at 10.)

Dr. Salem testified that Plaintiff and Dr. Dowd had a "strained[]" relationship, (Doc. 62-2 at 7, ¶ 51) (citation omitted), and that Dr. Dowd threatened to quit if Plaintiff stayed, which Plaintiff disputes because "after DHC terminated [Plaintiff]'s employment, Dr. Dowd served as a professional reference for her[] and spoke favorably of her." (Doc. 67-1 at 9) (citation omitted).

Regarding the end of Plaintiff's employment at DHC, DHC claims that Plaintiff resigned after telling DHC that "she wasn't interested in staying or being in a place that didn't want her" and was "inclined to resign." (Doc. 62-2 at 12, ¶ 72) (citation and internal quotation marks omitted); see also Doc. 62-13 at 80:21, 81:6 (Dr. Dobson testifying that Plaintiff said, "I'll resign[,]" and "I immediately said [o]kay[]") (internal quotation marks omitted). Plaintiff contends that DHC "terminated [her] employment without cause and without 120 days' prior written notice." (Doc. 67-2 at 6, ¶ 37) (citation omitted).

Dr. Salem testified that, during the September 2, 2021 meeting between himself, Dr. Dobson, and Plaintiff, he stated "that based on her performance, [] [Plaintiff] could either take the opportunity to voluntarily leave her employment[]" or "if she wished to stay on or continue, that an adverse event as it related to credentials was likely to occur." (Doc. 62-15 at 68:11-15.) According to Dr. Salem, Plaintiff indicated "she was inclined

20

to resign, but there was no decision made at the meeting." *Id.* at 70:2-4.

When asked whether she was relieved of her work effective September 3, 2021, Plaintiff testified: "I don't know the exact date of – my last day there was September 3, 2021. [Dr. Dobson] met with me[,] and he said he want[ed] me to stop working [at a] certain date which was a few days after we met. I don't have that [off the] top of my head." (Doc. 62-17 at 159:2-6.) Plaintiff testified, "I was let go[;] that's all I can tell you[,] and that's the important thing[.]" *Id.* at 160:2-3.

### 4.    Medical Director Pay.

With respect to Medical Director pay, Plaintiff claims she "was not provided with or informed about the DHC policy for recording hours worked as [the] Medical Director of Pathology." (Doc. 67-2 at 5, ¶ 33) (citations omitted). DHC disputes this and points to Plaintiff's testimony that, around June 21, 2021, she heard about DHC's policy for recording hours "through another [doctor,] and then I said, 'Oh, I didn't know about that.' Then she kind of helped me [] figure out how we have to do that[ and] where to record your hours." (Doc. 62-17 at 145:20-24.)

### 5.    Plaintiff's Employment at UConn Health.

As any issues with Plaintiff's employment at UConn Health postdate the cessation of her employment at DHC, the court will not consider them on summary judgment. They, however, may be admissible at trial for credibility determinations.

## II.    Conclusions of Law and Analysis.

### A.    Standard of Review.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that "'might affect the outcome of the suit under the governing law.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248). On a motion for summary judgment, the court "constru[es] the evidence in the light most favorable to the

nonmoving party and draw[s] all reasonable inferences in that party's favor." *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (internal quotation marks omitted) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011)).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion[] and identifying" the evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. To avoid summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

In adjudicating a motion for summary judgment, the district court's role "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Clark v. Hanley*, 89 F.4th 78, 95 (2d Cir. 2023) (internal quotation marks omitted) (quoting *Kee v. City of New York*, 12 F.4th 150, 166-67 (2d Cir. 2021)). Not all disputed issues of fact, however, are material, *see Anderson*, 477 U.S. at 248, or preclude summary judgment. *See id.* at 249-50 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal citations omitted).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (citation and internal quotation marks omitted). If the evidence "presents a sufficient disagreement to require submission to a jury[,]" the court should deny summary judgment. *Anderson*, 477 U.S. at 251-52.

In this case there are disputes of fact, however, not all of them are material to the resolution of at least some of Plaintiff's claims because even when regarded in the light most favorable to Plaintiff, a reasonable finder of fact could only reach one conclusion.

22

### B.    Whether DHC Is Entitled to Summary Judgment on Plaintiff's Breach of Contract Claim Regarding Medical Director Pay (Count I).

"Under New Hampshire law, a breach of contract occurs when there is a failure without legal excuse to perform any promise which forms the whole or part of a contract." *Teatotaller, LLC v. Facebook, Inc.*, 173 N.H. 442, 447, 242 A.3d 814, 818 (2020) (internal quotation marks and citation omitted).[6] DHC argues that it is entitled to summary judgment on Plaintiff's breach of contract claim regarding Medical Director pay because Plaintiff "did not perform [M]edical [D]irector[] work for a whole year, so [she] would not be entitled to the full amount[,]" and Plaintiff "was instructed on how to get paid for performing [M]edical [D]irector[] work and was paid $3,[75]0 for the hours she timely submitted." (Doc. 62-1 at 33) (emphasis omitted). The PEA provides that Plaintiff shall be paid $19,500 "for duties as described in the job description for Medical Director of Pathology." (Doc. 62-6 at 6, § 5(b).)

Even though DHC justifies its refusal to pay Plaintiff her Medical Director compensation based on her failure to timely submit her hours, the PEA does not state that Plaintiff must log and submit her hours to receive Medical Director pay. Nor does DHC provide evidence of any other policy provided to employees indicating that Medical Director hours must be logged and submitted in order to receive payment. DHC's evidence purporting to establish that Plaintiff knew she was required to submit her hours to receive Medical Director pay is an email from a DHC Administrative Assistant, on June 21, 2021, which reminded employees, including Plaintiff, to submit their Medical Director timesheets "in order to get paid[]" and to "remember that hours need to be entered within [thirty] []days of being worked, or they will not be paid[,] []per policy." (Doc. 62-18 at 63.) DHC offers no evidence that other employees forfeited their pay because they failed to timely log their hours.

Because DHC has failed to establish that Plaintiff was not entitled to her Medical

---

[6] New Hampshire law applies to Plaintiff's breach of contract claims because the PEA is "governed, construed, and enforced in accordance with the laws of the State of New Hampshire." (Doc. 62-6 at 10, § 12.)

23

Director pay on the ground that she neglected to timely log her hours, the court DENIES DHC's motion for summary judgment on Plaintiff's breach of contract claim regarding Medical Director pay.

### C.    Whether DHC Is Entitled to Summary Judgment on Plaintiff's Breach of Contract Claim Regarding Severance Pay (Count II).

Although the PEA does not explicitly refer to severance pay, if DHC terminated Plaintiff without cause, it required DHC to provide 120 days' prior notice or 120 days' base salary in lieu of notice. DHC did not provide either 120 days' prior notice or 120 days' base salary to Plaintiff. It claims that it was not required to do so because Plaintiff resigned or, in the alternative, was terminated for cause.

In the event of Plaintiff's resignation, DHC was not required to provide any notice or payment to her. Plaintiff nonetheless contends that she did not resign and was "let go" by DHC. (Doc. 62-17 at 20:3.) This fact is material and remains disputed.

DHC's alternative contention is that Plaintiff was terminated for cause. This is difficult to square with its admission that, "[d]uring and following the termination of [Plaintiff]'s employment, [it] claimed [] she resigned." (Doc. 67-2 at 6, ¶ 38) (citation omitted).

Under the PEA, termination for cause is effective "upon notification by DHC." (Doc. 62-6 at 7, § 6(c).) In the light most favorable to Plaintiff, the PEA required termination for cause to be in writing as generally required of notices under the PEA. *See id.* at 9, § 11 ("A notice given by one party to the other pursuant to this Agreement shall be deemed properly given if it is in writing[.]"). DHC provides no evidence of any written notification given to Plaintiff. Moreover, although DHC has the sole discretion to determine whether cause exists, under the PEA, DHC's decision to terminate an employee for cause is "subject to the due process review referred to in this Section[.]" *Id.* at 7, § 6(c). In its motion, DHC claims that Plaintiff "did not request" any due process review, (Doc. 62-1 at 34), but DHC did not include this allegation in its statement of facts or otherwise provide evidence to support it.

Because there are genuine issues of material fact regarding whether Plaintiff

24

resigned or was terminated for cause without written notice or a due process review, the court DENIES DHC's motion for summary judgment on Plaintiff's breach of contract claim regarding severance pay.

### D. Whether DHC Is Entitled to Summary Judgment on Plaintiff's Violation of NHWA Claim Regarding Medical Director Pay (Count III).

The NHWA allows an employee to bring suit "to recover unpaid wages[.]" N.H. Rev. Stat. Ann. § 275:53(I). Under the NHWA, "[t]he term 'wages' means compensation . . . for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission, or other basis of calculation." N.H. Rev. Stat. Ann. § 275:42(III). DHC does not contest, nor could it, that Plaintiff's Medical Director pay constitutes "wages" under the NHWA.

The NHWA provides that "[n]o employer may withhold or divert any portion of an employee's wages" unless certain enumerated circumstances exist. N.H. Rev. Stat. Ann. § 275:48(I). None of those circumstances justify DHC withholding Plaintiff's Medical Director pay, and DHC does not contend otherwise. Instead, DHC argues that, "given [Plaintiff's] assertion that New Hampshire law (including its three-year statute of limitations) applies to her wage claim because of the choice-of-law provision in her PEA, [Plaintiff] would not be able to recover any additional amount for hours she may claim to have worked prior to mid-June 2021[.]" (Doc. 62-1 at 33.)

Under New Hampshire law,

> all personal actions, except actions for slander or libel, may be brought only within [three] years of the act or omission complained of, except that when the injury and its causal relationship to the act or omission were not discovered and could not reasonably have been discovered at the time of the act or omission, the action shall be commenced within [three] years of the time the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the injury and its causal relationship to the act or omission complained of.

N.H. Rev. Stat. Ann. § 508:4. Section 508:4's three-year statute of limitations period applies to wage claims brought under the NHWA. *See Scacchi v. Dycom Indus., Inc.*, 297 F. Supp. 2d 406, 408 (D.N.H. 2004) ("[T]he three-year limitation period provided by

25

[N.H. Rev. Stat. Ann. §] 508:4 applies to [plaintiff]'s claim in Count IV under [N.H. Rev. Stat. Ann. §] 275:53."); *Campbell v. CGM, LLC*, 2017 WL 78474, at *12 (D.N.H. Jan. 9, 2017) (finding plaintiff's "wage[] claim is governed by a three-year statute of limitations[]") (citing N.H. Rev. Stat. Ann. § 508:4).

Plaintiff brought this action on June 14, 2024, and, therefore, her recovery of any unpaid Medical Director wages for work performed prior to June 14, 2021 is barred by the statute of limitations. Although DHC contends "there is no allegation (let alone evidence) that [Plaintiff] performed [M]edical [D]irector[] work after mid-June 2021," (Doc. 62-1 at 33), Plaintiff testified that she continued to perform work as DHC's Medical Director of Pathology until her employment ended in September 2021. Accordingly, a genuine dispute of material fact exists insofar as Plaintiff seeks to recover Medical Director pay for work performed after June 14, 2021 until on or about September 3, 2021.

For the foregoing reasons, the court GRANTS DHC's motion for summary judgment on Plaintiff's request for Medical Director pay for work performed prior to June 14, 2021 and DENIES DHC's motion for summary judgment to the extent that Plaintiff requests Medical Director pay for work performed after June 14, 2021.

**E.    Whether DHC Is Entitled to Summary Judgment on Plaintiff's Violation of NHWA Claim Regarding Severance Pay (Count IV).**

DHC contends that the payment of 120 days' base salary in lieu of notice for termination without cause is not "severance pay" under the NHWA. (Doc. 62-1 at 34) (internal quotation marks omitted). The NHWA provides that "severance pay, . . . when such benefit[] [is] a matter of employment practice or policy, or both, shall be considered wages pursuant to [N.H. Rev. Stat. Ann. §] 275:42, III, when due." N.H. Rev. Stat. Ann. § 275:43(V). However, the NHWA does not define "severance pay."

"A statute generally 'should be enforced according to its plain and unambiguous meaning.'" *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 111 (2d Cir. 2015) (citation omitted). Severance pay is generally defined as "[m]oney (apart from back wages or salary) that an employer pays to a dismissed employee." Black's Law Dictionary (12th

26

ed. 2024); *see also Matson v. Alarcon*, 651 F.3d 404, 409 (4th Cir. 2011) ("The term 'severance pay' is not defined in [11 U.S.C. § 507]. However, that term generally is defined as 'an allowance usually based on length of service that is payable to an employee' upon termination without cause.") (citing Webster's Third New International Dictionary 2081 (2002)). Because the PEA required 120 days' base salary in the event that DHC terminated Plaintiff without cause or without 120 days' notice, this constitutes "severance pay" and thus "wages" under the NHWA.

The NHWA provides that "[n]o employer may withhold or divert any portion of an employee's wages" unless certain enumerated circumstances exist. N.H. Rev. Stat. Ann. § 275:48(I). None of the enumerated circumstances justify DHC withholding Plaintiff's 120 days' base salary, and DHC does not contend otherwise.[7]

For the foregoing reasons, the court DENIES DHC's motion for summary judgment on Plaintiff's claimed violation of NHWA based on severance pay.

### F.   Whether Plaintiff Should Be Judicially Estopped From Asserting Her VFEPA Claims.

Plaintiff initially filed her wage claims under Vermont law and later amended her Complaint to assert those claims under New Hampshire law. DHC contends that, because Plaintiff "has previously asserted that New Hampshire law (including its statute of limitations) governs her statutory wage claims given the choice-of-law provision in the PEA (and concedes such claims would be untimely under Vermont law)[,]" she "should be estopped from asserting that Vermont law (including its statute of limitations) applies to her statutory discrimination and retaliation claims." (Doc. 62-1 at 23) (emphasis omitted).

Under the doctrine of judicial estoppel, "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he [or she] may not thereafter, simply because his [or her] interests have changed, assume a contrary position,

---

[7] DHC argues that no notice or payment in lieu of notice was required because it rightfully terminated Plaintiff for cause. Whether DHC terminated Plaintiff for cause must be decided by the jury.

27

especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him [or her]." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (internal quotation marks and citation omitted). In other words, "[t]he doctrine of judicial estoppel prevents a party from asserting a factual position in one legal proceeding that is contrary to a position that it successfully advanced in another proceeding." *Ashmore v. CGI Grp., Inc.*, 923 F.3d 260, 271 (2d Cir. 2019) (internal quotation marks and citation omitted). Judicial estoppel applies when "1) a party's later position is 'clearly inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel." *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010) (citation omitted).

By bringing claims under both New Hampshire and Vermont law, Plaintiff advances legal positions, rather than factual positions, to which the doctrine of judicial estoppel generally does not apply. *See, e.g., Seneca Nation of Indians v. State of N.Y.*, 26 F. Supp. 2d 555, 565 (W.D.N.Y. 1998) ("The court declines to extend the doctrine of judicial estoppel to include seemingly inconsistent legal positions."), *aff'd sub nom., Seneca Nation of Indians v. New York*, 178 F.3d 95 (2d Cir. 1999); *In re Leissner*, 2025 WL 2044201, at *5 (E.D.N.Y. July 20, 2025) ("Judicial estoppel typically only applies to inconsistent factual positions, not to issues of law.") (citations omitted). In any event, it is not inconsistent for Plaintiff to bring some claims under New Hampshire law and others under Vermont law.[8] In her motion to amend, Plaintiff conceded that Vermont's statute

---

[8] Although neither party offers a choice-of-law analysis, both Vermont and New Hampshire courts apply the *McDonnell Douglas Corp. v. Green* burden-shifting framework to their state discrimination and retaliation statutes. *See, e.g., Hammond v. Univ. of Vermont Med. Ctr.*, 2023 VT 31, ¶ 25, 218 Vt. 250, 259-60, 308 A.3d 421, 430 ("When . . . the evidence of discrimination is circumstantial rather than direct, we apply the three-part framework set forth . . . in *McDonnell Douglas*[.]"); *Wilson v. Calamar Mgmt. Grp., LLC*, 2019 WL 4542770, at *3 (D.N.H. Sept. 19, 2019) ("When direct evidence of discrimination is lacking for a claim under NH RSA chapter 354-A, the New Hampshire Supreme Court uses the *McDonnell Douglas* burden-shifting framework to evaluate circumstantial evidence."). It also appears that both Vermont and New Hampshire courts use the "motivating factor" test for discrimination claims and the "but-for" test for retaliation claims. *See Porter v. Dartmouth-Hitchcock Med. Ctr.*, 2025 WL 3296225, at *2

28

of limitations barred her wage claims and sought leave to bring those claims under New Hampshire law. She did not contend that New Hampshire law applied to her discrimination and retaliation claims.

For the foregoing reasons, the court finds that Plaintiff is not judicially estopped from bringing her discrimination and retaliation claims under Vermont law. To the extent DHC seeks summary judgment on this ground, its motion is DENIED.

## G.    Whether DHC Is Entitled to Summary Judgment on Plaintiff's Unlawful Discrimination Claim in Violation of VFEPA (Count V).

Under VFEPA, it is unlawful for any employer "to harass or discriminate against any individual because of race, color, religion, ancestry, national origin, sex, sexual orientation, gender identity, place of birth, crime victim status, or age or against a qualified individual with a disability." 21 V.S.A. § 495(a)(1). Title VII of the Civil Rights Act of 1964 ("Title VII") similarly prohibits an employer from discriminating against any individual "because of [his or her] race, color, religion, sex, or national origin[.]" 42 U.S.C.A. § 2000e-2(a)(1). "[V]FEPA is 'patterned on Title VII' and operates based on standards that are 'identical to those under Title VII.'" *In re Miller*, 2024 VT 35, ¶ 16, 219 Vt. 380, 389-90, 323 A.3d 984, 993 (citations omitted); *see also Hammond v. Univ. of Vermont Med. Ctr.*, 2023 VT 31, ¶ 24, 218 Vt. 250, 259, 308 A.3d 421, 430 ("[T]he standards and burdens of proof under [V]FEPA are identical to those under Title VII.") (internal quotation marks and citation omitted). As a result, a discrimination claim under VFEPA is subject to the *McDonnell Douglas* Title VII burden-shifting framework.

---

(D. Vt. Nov. 26, 2025) ("[T]he Vermont Supreme Court has consistently applied the 'motivating factor' test to claims under VFEPA[.]") (collecting cases); *Newton v. Kohl's, Inc.*, 2024 WL 4986303, at *15 (D. Vt. Nov. 12, 2024) (explaining that for a retaliation claim under Vermont law, a plaintiff must show that "the retaliation was a but-for cause of the employer's adverse action[]") (internal quotation marks omitted); *Wallace v. New Hampshire Ball Bearings, Inc.*, 2022 WL 279676, at *11 (D.N.H. Jan. 31, 2022) ("On this record, a reasonable jury could not plausibly infer that discriminatory animus was a motivating factor in her termination. Defendant is entitled to judgment on plaintiff's discrimination claim under . . . N.H. Rev. Stat. Ann. Section 354-A."); *Cooper v. White Mountain Cmty. Health Ctr.*, 2025 WL 2533669, at *6 (D.N.H. Sept. 3, 2025) (explaining that for a retaliation claim under New Hampshire law, "the plaintiff must show that the protected activity was the but-for cause of the adverse employment action[]") (citation omitted).

Under *McDonnell Douglas*, "a plaintiff must first establish a *prima facie* case of discrimination by showing that: '(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (citations omitted). "Once a plaintiff has established a *prima facie* case, a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors." *Id.* (citation omitted). "The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

"If the employer articulates such a reason for its actions, the burden shifts back to the plaintiff to prove that the employer's reason 'was in fact pretext' for discrimination." *Vega*, 801 F.3d at 83 (quoting *McDonnell Douglas*, 411 U.S. at 804). "[A] plaintiff may make either a traditional showing of 'pretext'—*i.e.*, that the employer's stated reason was false, and that the sole actual reason was discrimination—or a showing that even if the employer's reason is true, discrimination was still a motivating factor in the employment decision." *Bart v. Golub Corp.*, 96 F.4th 566, 573-74 (2d Cir. 2024) (emphasis omitted); *see also Hammond*, 2023 VT at ¶ 34, 218 Vt. at 263-64, 308 A.3d at 432-33 (granting summary judgment for defendant on plaintiff's VFEPA discrimination claim because plaintiff "has failed to provide other evidence from which a jury could conclude that plaintiff's termination was actually motivated by race"). In other words, a plaintiff "may also satisfy this burden by adducing evidence that, even if the employer had mixed motives, the plaintiff's membership in a protected class was at least one motivating factor in the employer's adverse action." *Bart*, 96 F.4th at 567.

### 1. Whether Plaintiff Can Establish a *Prima Facie* Case of Discrimination.

DHC does not dispute that Plaintiff is a member of a protected class, as she is from Iran and protected under VFEPA due to her national origin. Instead, DHC argues "even assuming for purposes of this motion that [Plaintiff] did not voluntarily resign, but

30

rather was discharged, she cannot show she was qualified for her position at [DHC] or, if she was, that the circumstances give rise to an inference of discrimination." (Doc. 62-1 at 24-25.) Because whether Plaintiff resigned or was terminated with or without cause is disputed, the court cannot grant summary judgment to DHC on the lack of an adverse employment action. DHC's remaining challenges are to the second and fourth elements of Plaintiff's *prima facie* case.

### a.      Whether Plaintiff Was Qualified for Her Position.

"Under *McDonnell Douglas*, if [a] plaintiff is not objectively qualified for the position, then [he or] she cannot make out a *prima facie* case." *Robertson v. Mylan Lab'ys, Inc.*, 2004 VT 15, ¶ 29, 176 Vt. 356, 368, 848 A.2d 310, 321 (emphasis supplied). The Second Circuit has held that, in order for a plaintiff to establish qualification for a position, the plaintiff must demonstrate "basic eligibility for the position at issue[.]" *Aulicino v. New York City Dep't of Homeless Servs.*, 580 F.3d 73, 81 (2d Cir. 2009) (internal quotation marks omitted). "[E]specially where discharge is at issue and the employer has already hired the employee, the inference of minimal qualification is not difficult to draw." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001), *as amended* (June 6, 2001).

It is undisputed that Plaintiff obtained a medical degree from the University of Texas, has been a board-certified pathologist in both surgical and clinical pathology since 2010, and has held a medical license to practice in Vermont since 2012. She has performed a one-year surgical pathology fellowship, authored or co-authored approximately twenty-five medical publications, and delivered numerous lectures and presentations on pathology. Although the nature of her work there is disputed, she also held a position as a pathologist for eight years at UVMMC prior to being hired by DHC. DHC hired Plaintiff as a pathologist and Medical Director, where she worked for nearly ten months. There is thus some evidence that DHC deemed her qualified for the position. *See Summerlin v. Almost Fam., Inc.*, 2015 WL 7428524, at *3 (D. Conn. Nov. 20, 2015) (holding a reasonable jury could find plaintiff was qualified for her position because "defendant had previously hired her for one of the positions for which defendant now

31

asserts she is not qualified[]"); *Burnett v. Trinity Inst. Homer Perkins Ctr., Inc.*, 2011 WL 1752237, at *3 (N.D.N.Y. May 6, 2011) ("Defendant does not contend that plaintiff was not qualified for her job, nor could [it], considering that she was hired for the position and held it for several months.").

Viewing the evidence in a light most favorable to Plaintiff, a reasonable jury could find that she was qualified for her position at DHC. *See Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (finding, at the summary judgment stage, plaintiff "has shown that he was qualified for the position[]" of supervisory criminal investigator because he "had seventeen years of experience, twenty-seven citations for superior accomplishments and outstanding performance, and a history of positive performance evaluations on a wide range of job elements[]"). For purposes of summary judgment, Plaintiff has therefore established the second prong of her *prima facie* case of discrimination.

### b.  Whether the Circumstances of Plaintiff's Termination Give Rise to an Inference of Discrimination.

"Under the fourth element of the *McDonnell Douglas* test, a plaintiff must present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race, color, religion, sex, or national origin was a motivating factor contributing to the employer's decision to take the adverse employment action." *Winslow v. Pulaski Acad.*, 448 F. Supp. 3d 197, 208 (N.D.N.Y. 2020) (emphasis and internal quotation marks omitted) (quoting *Vega*, 801 F.3d at 85). National origin discrimination includes discrimination "because an individual has the physical, cultural[,] or linguistic characteristics of a national origin group." *Deravin v. Kerik*, 335 F.3d 195, 201 n.4 (2d Cir. 2003) (internal quotation marks and citation omitted).[9]

---

[9] *See also Yili Tseng v. Fla. A & M Univ.*, 380 F. App'x 908, 909 (11th Cir. 2010) ("Discrimination based on accent can be national origin discrimination.") (citation omitted); *Carino v. Univ. of Oklahoma Bd. of Regents*, 750 F.2d 815, 819 (10th Cir. 1984) ("A foreign accent that does not interfere with a Title VII claimant's ability to perform duties of the position he [or she] has been denied is not a legitimate justification for adverse employment decisions.") (citation omitted); *Shu-Chen Kuo v. Winklevoss Consultants, Inc.*, 2018 WL 4623023, at *13 (D. Conn. Sept. 26, 2018) ("An adverse employment decision may be predicated upon an individual's accent when—but only when—it interferes materially with job performance.")

"An inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (citation omitted). "Because the district court is not to resolve issues of fact on a summary judgment motion, 'its determination of whether the circumstances give rise to an inference of discrimination must be a determination of whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive.'" *Abdelal v. Police Comm'r*, 857 F. App'x 30, 31 (2d Cir. 2021) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 38 (2d Cir. 1994)).

Plaintiff argues that the "circumstances surrounding [her] termination give rise to an inference of discrimination[]" because "Dr. Dobson terminated [her] employment after referring to her speaking style as tangential, exhibiting facial expressions indicating he could not understand her, and suggesting that she take classes on how to speak." (Doc. 67 at 11-12.) "Generally, courts have recognized that stray or isolated remarks in the workplace without a demonstrated nexus to the challenged employment action will not defeat a summary judgment motion[,]" *Abboud v. Cnty. of Onondaga*, 341 F. Supp. 3d 164, 180 (N.D.N.Y. 2018) (collecting cases), and "stray remarks even of a decision-maker, without more, cannot prove a claim of employment discrimination." *Chan v. Donahoe*, 63 F. Supp. 3d 271, 294 (E.D.N.Y. 2014) (citations omitted). The Second Circuit, however, has cautioned that:

> While it is true that the stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination, we have held that when "other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance."

(citation omitted); *Tomizawa v. ADT LLC*, 2015 WL 5772106, at *20 (E.D.N.Y. Sept. 29, 2015) (same).

33

*Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) (internal citation omitted).

DHC argues that Dr. Dobson could not have been motivated by Plaintiff's national origin in terminating her because "Dr. Dobson hired [Plaintiff] with the same accent and also knew she was from Iran." (Doc. 62-1 at 28.) Under the Age and Discrimination in Employment Act ("ADEA"), "where the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." *Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000) (internal quotation marks and citation omitted). The Second Circuit "ha[s] not determined whether the same[]actor inference, which we have applied in the context of age discrimination claims under the ADEA, should also apply to claims under Title VII." *Buon v. Spindler*, 65 F.4th 64, 84 (2d Cir. 2023) (citation omitted). Therefore, the court will not apply the same actor inference here.

Although Plaintiff claims Dr. Dobson made remarks to her such as "what did you say?" "I don't understand[,]" "you speak tangential[ly]," "it's hard to understand you[,]" and "[you] need to go to a class to learn how to speak[,]" (Doc. 62-19 at 13:23-14:2; Doc. 62-17 at 95:20-21), it is undisputed that Dr. Dobson never directly commented on Plaintiff's accent. *See Tomizawa v. ADT LLC*, 2015 WL 5772106, at *18 (E.D.N.Y. Sept. 29, 2015) ("A comment regarding an employee's accent must . . . be probative of discriminatory intent[;] *i.e.*[,] a supervisor saying that he does not like an employee's accent, to reflect some bias.") (internal quotation marks and citations omitted). "Evidence that employees in a supervisory role referenced plaintiff's accent and difficulty in understanding plaintiff is generally insufficient to establish discriminatory animus." *Perard v. Jamaica Hosp. Med. Ctr.*, 2020 WL 5633153, at *16 (E.D.N.Y. Sept. 20, 2020) (collecting cases).[10]

---

[10] *See also Ponniah Das v. Our Lady of Mercy Med. Ctr.*, 2002 WL 826877, at *10 (S.D.N.Y. Apr. 30, 2002) (granting defendant summary judgment because "[t]hat [plaintiff's supervisor] said that she could not understand [plaintiff]'s accent does not support a claim of discrimination[]"), *aff'd sub nom.*, *Das v. Our Lady of Mercy Med. Ctr.*, 56 F. App'x 12 (2d Cir. 2003); *Chan v. Donahoe*, 63 F. Supp. 3d 271, 298 (E.D.N.Y. 2014) (granting defendant

Dr. Dobson made comments about Plaintiff's tangential way of speaking in a meeting on June 30, 2021 and in emails on July 1, 2021 and July 12, 2021, which was months prior to Plaintiff's termination. Plaintiff does not identify when Dr. Dobson's other comment that she should take classes to learn how to speak was made. The latter remark is ambiguous in that it could equally apply to Plaintiff's indirect conversational style as well as to her accent. *See Bina v. Providence Coll.*, 39 F.3d 21, 26 (1st Cir. 1994) ("[R]eferences to . . . difficulty in understanding [plaintiff] may reasonably be interpreted as expressing a concern about his ability to communicate to students rather than discriminatory animus based on ethnicity or accent.").

Dr. Dobson told Plaintiff that "being [M]edical [D]irector of the laboratory requires clear communication to set expectations[.]" (Doc. 62-18 at 86.) He criticized Plaintiff's tangential way of speaking because there were complaints that Plaintiff "would 'avoid the question that she was being asked[,]' which 'led to frustration among the staff.'" (Doc. 62-2 at 8, ¶ 54) (alteration adopted) (citation omitted); *see also Shu-Chen Kuo v. Winklevoss Consultants, Inc.*, 2018 WL 4623023, at *13 (D. Conn. Sept. 26, 2018) ("There is nothing improper about an employer making an honest assessment of the oral communications skills of [an employee] when such skills are reasonably related to job performance.") (citation omitted). Plaintiff cites no evidence that Dr. Dobson terminated her because of her accent or that her accent was a motivating factor in her termination, and a reasonable jury could not find otherwise. *See Manko v. Deutsche Bank*, 554 F. Supp. 2d 467, 479 n.36 (S.D.N.Y. 2008) (granting defendant summary judgment on employment discrimination claim because "[t]hough [supervisor]'s comments about [plaintiff]'s accent 'may be probative of discriminatory intent,' there is no record evidence that her accent was the basis for an adverse employment action[]") (internal citation omitted), *aff'd*, 354 F. App'x 559 (2d Cir. 2009).

---

summary judgment because plaintiff's supervisor "jok[ing] about the way [plaintiff] spoke English, mimick[ing] his accent, and ask[ing] him how to spell words like 'library,' 'whatever,' and 'hour[]'" was "insufficient to support an inference of race discrimination under the *McDonnell Douglas* framework[]").

Because a reasonable jury could not find that the circumstances of Plaintiff's termination give rise to an inference of discrimination, Plaintiff cannot establish a *prima facie* case of discrimination. However, because the burden at the *prima facie* stage is not onerous, the court proceeds to analyze the remaining prongs of the *McDonnell Douglas* framework.

### 2. Whether DHC Can Establish Legitimate, Nondiscriminatory Reasons for Terminating Plaintiff.

A defendant's burden to establish a legitimate, nondiscriminatory reason for an adverse employment action "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (citation omitted). DHC has proffered legitimate, nondiscriminatory reasons for Plaintiff's termination, including her unsatisfactory work and struggles with coworkers, for which there is ample evidentiary support in the record. *See Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985) ("[T]he undisputed facts [] established [plaintiff]'s profound inability to get along with her co-workers. This represents a legitimate, nondiscriminatory reason for an employment decision."); *New York ex rel. Khurana v. Spherion Corp.*, 511 F. Supp. 3d 455, 481 (S.D.N.Y. 2021) ("[Plaintiff]'s inability to get along with his coworkers [is a] legitimate . . . reason for his termination."); *Wolf v. Time Warner, Inc.*, 2012 WL 4336232, at *10 (S.D.N.Y. Sept. 17, 2012) (finding that plaintiff's "questionable professional judgment and her repeated difficulties interacting with colleagues and supervisors[]" were legitimate, nondiscriminatory reasons for her termination), *aff'd*, 548 F. App'x 693 (2d Cir. 2013).

For purposes of summary judgment, DHC's purported reasons constitute legitimate, nondiscriminatory bases for Plaintiff's termination, and the burden therefore shifts to Plaintiff to establish that these reasons were pretextual or that unlawful discrimination was at least a motivating factor in her termination. *See, e.g., Richmond v. Sorensen*, 2025 WL 41964, at *4 (S.D.N.Y. Jan. 7, 2025) ("[D]efendant has articulated a legitimate, nondiscriminatory reason for terminating plaintiff's employment—namely, plaintiff's poor job performance. The burden thus shifts to plaintiff to show defendant's

36

proffered reason is pretext for unlawful [] discrimination."), *aff'd*, 2026 WL 891218 (2d Cir. Apr. 1, 2026).

### 3.    Whether Plaintiff Can Establish That DHC's Legitimate, Nondiscriminatory Reasons for Terminating Plaintiff Were Pretextual.

"[W]hile a plaintiff may satisfy the third-stage burden under *McDonnell Douglas* by showing that the employer's stated reason was false and just a pretext, or cover, for a discriminatory intent, a plaintiff is not required to demonstrate the falsity of the employer's proffered reason." *Bart*, 96 F.4th at 570 (emphasis and citation omitted). "Instead, 'a . . . plaintiff can prevail by proving that an impermissible factor was a motivating factor, without proving that the employer's proffered explanation was not some part of the employer's motivation.'" *Id.* (emphasis and citation omitted).

On the issue of pretext, *Kho v. New York & Presbyterian Hosp.*, 344 F. Supp. 3d 705 (S.D.N.Y. 2018) is instructive. There, the plaintiff brought an employment discrimination claim under Title VII against her employer based on her supervisor "criticizing her accent, saying that she 'needs to speak English' and 'no one can understand her Chinese accent[,]'" and the employer moved for summary judgment. *Id.* at 719 (alterations adopted). The employer offered "a legitimate, [nondiscriminatory] reason for [the plaintiff]'s termination, namely her poor performance, including violations of various of the [employer]'s policies, as documented by the numerous complaints made against her during the course of her employment—by [coworkers] and patients alike—and the resulting disciplinary measures, including two instances on which she was placed on work improvement plans." *Id.* at 718. The court determined the plaintiff could not establish the employer's proffered rationale was pretextual and granted the employer summary judgment, reasoning that the supervisor's comments "do not establish that [the supervisor] harbored any discriminatory animus, either based on her accent or people with a similar accent or who are of the same race or national origin[,]" the supervisor "made these comments in the context of performance reviews and her language skills were reasonably related to her job performance[,]" and "complaints about

37

[the plaintiff] began within several months of her hiring, continuing relatively unabated for seven years until she was fired." *Id.* at 719-21.

Plaintiff was a Medical Director at DHC which required effective communication and, similar to the supervisor in *Kho*, Dr. Dobson commented on Plaintiff's communication style solely in the context of her work performance. *See Thelusma v. New York City Bd. of Educ.*, 2006 WL 2620396, at *3 (E.D.N.Y. Sept. 13, 2006) (granting defendant summary judgment because the supervisor's suggestion that plaintiff "take 'accent reduction classes'" is "consistent with a beneficent design to afford him the opportunity to improve his communication skills, an absolute prerequisite for adequate job performance by a teacher, rather than evidence of a discriminatory intent[]"). Dr. Dobson was, however, by no means the only person who complained about Plaintiff's performance. Other DHC employees were frustrated by Plaintiff's leadership and communication style, and Dr. Dobson advised Plaintiff that "[l]aboratory staff have expressed a lack of clarity in communications with and directives from you as a pathologist and as the [Medical D]irector[.]" (Doc. 62-18 at 85.)

Other evidence of Plaintiff's performance issues also exists. Plaintiff worked with two other pathologists during her tenure, Dr. Qiu and Dr. Dowd. Within two months of Plaintiff's hiring, Dr. Qiu resigned because she could not work with Plaintiff, and, towards the end of Plaintiff's employment, Dr. Dowd threatened to resign if Plaintiff continued to work at DHC. Ms. Bond, Nurse Bolognani, and Dr. Ives each voiced concerns regarding Plaintiff's work, deeming it "unacceptable[,]" indicating that it "cannot continue[,]" and demanding "more immediate action as it poses ongoing risk to patient care and outcomes." (Doc. 62-14 at 16-17.)

Plaintiff points out that Dr. Dobson told Connecticut licensing authorities that Plaintiff "did practice with reasonable skill and safety[;]" however, this review was "[b]ased on incomplete information and observation" as Plaintiff "resigned before her practice evaluation was complete[.]" (Doc. 72-3 at 1.) Plaintiff further argues that "DHC's treatment of Dr. Qiu and Dr. Dowd[,] who had performance issues, contrasted with its treatment of [Plaintiff]." (Doc. 67 at 14.) In so arguing, Plaintiff asserts that Dr.

38

Qiu made several misdiagnoses and Dr. Dowd made poor quality reads, but the evidence on which Plaintiff relies to support her contentions is her own affidavit unsupported by citations to other evidence. "Courts routinely reject self-serving affidavits as bases for establishing a genuine dispute of material fact." *Bryant v. Steele*, 462 F. Supp. 3d 249, 258 (E.D.N.Y. 2020) (collecting cases), *aff'd sub nom.*, *Bryant v. Iheanacho*, 859 F. App'x 604 (2d Cir. 2021). Plaintiff's affidavit also contradicts her acknowledgement that, as of June 22, 2021, no DHC staff members had raised concerns about Dr. Dowd's work performance and Dr. Dobson's July 12, 2021 observation that "DH[]C pathology who reviewed a selection of Dr. Dowd's cases[] not[ed] concurrence with a majority of reads[.]" (Doc. 62-18 at 85.)

Plaintiff does not dispute that DHC received complaints about her work and her interpersonal and communication skills from a number of sources, although she disputes whether the complaints were accurate. As the Second Circuit has explained, however, "[i]n a discrimination case, . . . we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what 'motivated the employer[]'[;] the factual validity of the underlying imputation against the employee is not at issue." *McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) (emphasis and internal citation omitted); *see also Cameron v. Cmty. Aid For Retarded Child., Inc.*, 335 F.3d 60, 65 (2d Cir. 2003) (explaining that "the truth of the complaints expressed against [plaintiff] to [the employer] by various employees[]" was not "material to the dispute at hand" because "[t]he inaccuracy of those reports does not matter if [the employer] believed them[]"); *Female Port Auth. Officer 47708 v. Port Auth. of N.Y. & N.J.*, 2018 WL 3489569, at *10 (E.D.N.Y. July 19, 2018) ("[O]ur inquiry is not whether [p]laintiff in fact lied to [her supervisor], but whether this was the true reason for her termination."), *aff'd sub nom.*, *Howard v. Port Auth. of N.Y. & N.J.*, 771 F. App'x 130 (2d Cir. 2019).

Plaintiff has not proffered any evidence that Dr. Dobson's comments regarding her performance were motivated by discriminatory animus or pretextual, especially because Dr. Dobson never specifically commented on Plaintiff's accent and because he "hired" Plaintiff "with the same accent." *Liu v. Eaton Corp.*, 2021 WL 1736892, at *3 (E.D.N.C.

May 3, 2021); *see also id.* at *1 (dismissing a discrimination claim of plaintiff born in China who spoke "English as a second language, 'with [a] rather strong accent[]'").[11] "[I]t would be an inferential leap to infer that a comment about an employee's accent suggests an underlying bias against persons of that national origin[.]" *Manessis v. New York City Dep't of Transp.*, 2003 WL 289969, at *8 (S.D.N.Y. Feb. 10, 2003) (citing *Watt v. N.Y. Botanical Garden*, 2000 WL 193626, at *7 (S.D.N.Y. Feb. 16, 2000)), *aff'd sub nom.*, *Manessis v. Chasin*, 86 F. App'x 464 (2d Cir. 2004); *see also Alsharqi v. Main Line Health, Inc.*, 2025 WL 2804421, at *6 (E.D. Pa. Oct. 1, 2025) ("[Supervisor]'s two remarks regarding [plaintiff]'s accent, without more, cannot sustain an inference of national origin discrimination. References to his 'culture' or 'accent,' even if awkward or insensitive, were stray remarks tied to communication and patient care, not his Iraqi heritage. And while he might have an accent as a result of his national origin, the two are not the same.") (internal citation omitted).

Viewing the evidence in the light most favorable to Plaintiff, no reasonable jury could conclude that DHC's nondiscriminatory, work-related reasons for terminating Plaintiff were pretextual or that discrimination was a motivating factor for her termination. *See Mancini v. Accredo Health Grp., Inc.*, 411 F. Supp. 3d 243, 254-55 (D. Conn. 2019) ("[N]o reasonable jury could find that [defendant]'s proffered reasons—the serious misconduct complained of by [plaintiff]'s patients, some of which [plaintiff] herself admits—were pretext for disability discrimination."). For the foregoing reasons, the court GRANTS DHC's motion for summary judgment on Plaintiff's discrimination

---

[11] *See also Zann Kwan v. Andalex Grp., LLC*, 2012 WL 1862768, at *7 (S.D.N.Y. May 22, 2012) (finding plaintiff's supervisor saying plaintiff's "accent was weird [with reference] to her alienage—are simply not actionable, let alone sufficient to raise a triable issue as to pretext[]"), *aff'd in part, vacated in part on other grounds*, 737 F.3d 834 (2d Cir. 2013); *Grant v. Cont'l Cas. Co.*, 2015 WL 1499724, at *8 (S.D.N.Y. Mar. 30, 2015) (finding plaintiff's supervisor "often sa[ying], 'I don't understand you[;] you're not being clear,' and routinely sigh[ing] during conversations with [p]laintiff" was insufficient for a reasonable jury to find pretext because "the remarks at issue here are devoid of direct or even oblique reference to race or national origin and, even in context of the full record, are not probative of [supervisor]'s animus with respect to those with accents generally or, more importantly, with respect to [p]laintiff's accent or national origin specifically[]").

claim alleging a violation of VFEPA.

### H. Whether DHC Is Entitled to Summary Judgment on Plaintiff's Retaliation Claim in Violation of VFEPA (Count VI).

Under VFEPA, "[a]n employer . . . shall not discharge or in any other manner discriminate against any employee because the employee . . . has opposed any act or practice that is prohibited under this chapter[.]" 21 V.S.A. § 495(a)(8)(A). A retaliation claim under VFEPA is subject to the same *McDonnell Douglas* burden-shifting framework.

Under this framework, a plaintiff must establish a *prima facie* case of retaliation by showing "that (1) [he or she was] engaged in a protected activity, (2) [his or her] employer was aware of that activity, (3) [he or she] suffered adverse employment decisions, and (4) there was a causal connection between the protected activity and the adverse employment decision."[12] *Hammond*, 2023 VT at ¶ 38, 218 Vt. at 265, 308 A.3d

---

[12] Plaintiff argues that the motivating factor and mixed-motive causation standards apply to her retaliation claim under VFEPA and, in doing so, cites *Mayhew v. Hermitage Club, LLC*, wherein the court stated:

> [The d]efendants argue in a footnote that to prevail on her retaliation claim, [the p]laintiff must prove that her comments were the but-for cause of the termination of her employment, citing the [] Supreme Court's decision in *Univ. of Texas Sw. Med. Ctr. v. Nassar*, [570 U.S. 338] (2013). In that case, the Court found that "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action" and that mixed-motive claims would therefore not be recognized. However, the case law on wrongful discharge in Vermont references VFEPA precedents in establishing the appropriate standards, and VFEPA case law in turn looks to Title VII's anti-discrimination precedents. Moreover, in *Adams*, the Supreme Court upheld a lower court jury instruction that would require the jury to find that the protected activity was "the sole *or princip[al]* reason for the termination[,]"[] implicitly recognizing that the adverse employment action could have more than one cause. *Adams v. Green Mountain [R.R.]*, 862 A.2d 233, 235 (Vt. 2004) (emphasis [supplied]).

2016 WL 6997490, at *3 n.1 (D. Vt. Nov. 30, 2016). The standard for Title VII retaliation claims is but-for causation, *see Nassar*, 570 U.S. at 362, and the Vermont Supreme Court has recently emphasized that the "standards and burdens of proof under [V]FEPA are *identical* to those under Title VII." *Hammond*, 2023 VT at ¶ 24, 218 Vt. at 259, 308 A.3d at 430 (emphasis supplied) (internal quotation marks and citation omitted); *see also Porter*, 2025 WL 3296225, at *6 ("[T]he Vermont Supreme Court has repeatedly held that the standards and burdens of proof to be applied under VFEPA are identical to those applied under Title VII[.]"). As a result, courts

at 434 (internal quotation marks and citation omitted). "Once a plaintiff makes out a *prima facie* case of retaliation, the burden shifts to the employer to give a legitimate reason for its actions, and, if the employer does so, the burden then shifts back to the plaintiff to show that the employer's explanation is a pretext for retaliation." *Aflalo v. Cantor Fitzgerald, L.P.*, 298 F. Supp. 3d 688, 694 (S.D.N.Y. 2018) (emphasis supplied) (internal quotation marks and citation omitted).

### 1. Whether Plaintiff Can Establish a *Prima Facie* Case of Retaliation.

DHC does not dispute that Plaintiff engaged in a protected activity under VFEPA by bringing a complaint of discrimination against UVMMC, but it contends that Plaintiff's "retaliation claim fails because there is no evidence that anyone at DHC (let alone any decision[-]maker) was aware of such complaint prior to her separation." (Doc. 62-1 at 32) (emphasis and citation omitted).

For the second element of a *prima facie* case of retaliation, a plaintiff must show the employer was "aware" that the plaintiff engaged in a protected activity. *Hammond*, 2023 VT at ¶ 38, 218 Vt. at 265, 308 A.3d at 434. With respect to employers that are entities, "[n]othing 'more . . . than general corporate knowledge that the plaintiff has engaged in a protected activity'" is required to show awareness. *Summa v. Hofstra Univ.*, 708 F.3d 115, 125-26 (2d Cir. 2013) (citation omitted). "Such general corporate knowledge 'arises when a supervisor, corporate officer, or employee whose job it is to investigate and resolve discrimination complaints becomes aware of the protected activity.'" *McSweeney v. Cohen*, 776 F. Supp. 3d 200, 252 n.17 (S.D.N.Y. 2025) (alteration adopted) (citations omitted).

---

have applied the but-for standard to VFEPA retaliation claims. *See, e.g.*, *McCullough v. Fed. Express Corp.*, 2023 WL 3044811, at *12 (D. Vt. Apr. 21, 2023) ("A plaintiff bringing a [VFEPA] retaliation claim must show that 'retaliation was a but-for cause of the adverse action[;] however, but-for causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive.'") (alterations adopted) (citation omitted); *Cole v. Foxmar, Inc.*, 2021 WL 5178822, at *13 (D. Vt. Mar. 8, 2021) (same). Nonetheless, the court need not decide this issue because Plaintiff cannot satisfy even the motivating factor standard.

Plaintiff argues DHC and Dr. Dobson were aware of her discrimination complaint against UVMMC because, "[i]n a June 30, 2021, meeting with Dr. Dobson and Dr. Salem, Dr. Dobson said that [Plaintiff] had 'similar issues' or 'problems' with other individuals while she was at UVMMC." (Doc. 67 at 18) (citation omitted). There is no evidence, however, that Dr. Dobson knew Plaintiff had filed a discrimination complaint against UVMMC,[13] or that Plaintiff otherwise advised DHC of her claim against UVMMC. Dr. Dobson asked her whether she had similar difficulties with coworkers in her prior employment when discussing how Plaintiff was "difficult to work with[.]" (Doc. 62-17 at 65:5-9.) It is undisputed that Plaintiff never complained of discrimination during her employment at DHC, nor did she make a formal or informal complaint of discrimination against DHC while employed there.

Although Plaintiff's claim that DHC was aware of her discrimination complaint against UVMMC appears to be purely speculative, the court need not make this determination because Plaintiff cannot establish that DHC's legitimate, nonretaliatory reasons for termination were pretextual.

### 2.     Whether DHC Can Establish Legitimate, Nonretaliatory Reasons for Terminating Plaintiff.

DHC cites Plaintiff's unsatisfactory work and struggles with coworkers as legitimate, nonretaliatory reasons for her termination. The burden thus shifts to Plaintiff to establish pretext. *See, e.g., Sorensen*, 2025 WL 41964, at *4.

### 3.     Whether Plaintiff Can Establish That DHC's Legitimate, Nonretaliatory Reasons for Terminating Plaintiff Were Pretextual.

Plaintiff argues that "DHC's purported reason[s] for termination of [her] employment [are] pretextual, as evidenced by: (1) the fact that [Plaintiff] was able to

---

[13] *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 82 (2d Cir. 2005) ("[A] defendant's discriminatory intent cannot be inferred, even at the *prima facie* stage, from circumstances unknown to the defendant."); *Medina-Rivera v. MVM, Inc.*, 713 F.3d 132, 139 (1st Cir. 2013) ("[T]he employee must show that the retaliator knew about [his or] her protected activity—after all, one cannot have been motivated to retaliate by something he [or she] was unaware of.") (citations omitted).

obtain certification in New York during her employment with DHC and to obtain licensure in Connecticut after her termination; (2) DHC's more favorable treatment of Dr. Qiu and Dr. Dowd; and (3) facts showing that [Plaintiff]'s alleged interpersonal issues were not what DHC makes them out to be." (Doc. 67 at 19.) In essence, Plaintiff argues that DHC retaliated against her for filing a discrimination complaint against her former employer and manufactured her performance problems as a cover for its retaliation. Even in the light most favorable to Plaintiff, this remains pure speculation bereft of admissible supporting facts. *See Cohen v. Fed. Express Corp.*, 544 F. Supp. 2d 334, 344 (S.D.N.Y. 2008) ("Plaintiff has not presented any admissible evidence indicating that Defendant's proffered reasons were merely a pretext for unlawful discrimination or retaliation. . . . The [c]ourt, therefore, concludes that [d]efendants are entitled to summary judgment on [p]laintiff's discrimination and retaliation claims."), *aff'd*, 383 F. App'x 88 (2d Cir. 2010).

For the reasons stated above, no reasonable jury could conclude that DHC's nonretaliatory, work-related reasons for terminating Plaintiff were pretextual or that retaliation for filing a discrimination complaint against her former employer was a motivating factor for her termination. The court therefore GRANTS DHC's motion for summary judgment on Plaintiff's retaliation claim alleging a violation of VFEPA.

## CONCLUSION

For the foregoing reasons, the court DENIES DHC's motion for summary judgment on Plaintiff's breach of contract claim regarding Medical Director pay for the June 14, 2021 to September 3, 2021 time period (Count I), Plaintiff's breach of contract claim regarding severance pay (Count II), Plaintiff's violation of NHWA claim regarding Medical Director pay (Count III), and Plaintiff's violation of NHWA claim regarding severance pay (Count IV) and GRANTS DHC's motion for summary judgment on Plaintiff's violation of NHWA claim regarding Medical Director pay prior to June 14, 2021 (Count III), Plaintiff's discrimination in violation of VFEPA claim (Count V), and Plaintiff's retaliation in violation of VFEPA claim (Count VI).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this __6th__ day of July, 2026.

Christina Reiss, Chief Judge
United States District Court